FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

2003 AUG -1 P 3: 46

IN ADMIRALTY

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

IN THE MATTER OF:                    CASE NO: 3:03-CV-95-J-12 TEM

IN RE: MARTIN K. EBY CONSTRUCTION
CO., INC., a corporation, as owner
*pro hac vice* of the Tug MISS NELLIE,
a commercial tug boat, official document
number DO 512137, in a cause of action
for exoneration from or limitation
of liability.

        Petitioner.

_____/

## MEMORANDUM OF LAW IN OPPOSITION TO PETITIONER'S MOTION FOR SUMMARY JUDGMENT

THE LOWENTHAL GROUP, INC. ("Lowenthal") hereby submits this Memorandum of Law in Opposition to Petitioner's Motion for Summary Judgment and would show this Court as follows:

Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment is to be granted only if the evidence indicates that no genuine issue material fact exists. Additionally, the moving party has the burden of showing that there is an absence of evidence to support the non-moving party's case. Celotex v. Catrett, 477 U.S. 317, 325 (1986). In the instant case, it is clear that the moving party, Martin K. EBY Construction Co., Inc. ("EBY"), has not met its burden to support this Court's granting of summary judgment in its favor.

Specifically, it is clear under general maritime law that a vicariously liable or non-negligent tortfeasor is entitled to

24

indemnity "from a co-debtor guilty of actual fault."  See, e.g., Marathon Pipe Line Co. v. Drilling Rig ROWAN/ODESSA, 761 F.2d 229, 236 (5th Cir. 1985); see also Miller v. American President Lines, Ltd., 989 F.2d 1450 (6th Cir. 1993); Hardy v. Gulf Oil Corp., 949 F.2d 826, 833 (5th Cir. 1992).  As a result, defendants who are liable to a plaintiff under a theory of constructive liability or imputed fault are free to pursue a claim for indemnity against the one whose fault actually caused the plaintiff's injury.  See Hardy, 949 F.2d at 833 n. 12.

In the instant case, Barbara B. Mongeon, as Personal Representative of the Estate of Beverly Brittain ("The Estate"), commenced a lawsuit against Lowenthal and EBY under the Jones Act and theories of Unseaworthiness for the drowning death of Beverly Brittain.  Thereafter, Lowenthal asserted a cross claim against EBY for indemnity (the "Claim"), alleging that, to the extent that it might be found liable to The Estate, its liability would be merely vicarious, constructive, or derivative, and would be based on the wrongdoing of EBY.  Thus, in the event that Lowenthal is found liable for damages to the Estate based upon its vicarious, constructive, or derivative fault, it must be entitled to indemnity from EBY.

Initially, EBY claims in its Memorandum of Law that Lowenthal has not alleged a relationship and the facts do not substantiate a relationship that would make Lowenthal vicariously liable for the

negligent acts of EBY.  _See_ Petitioner's Memorandum of Law at p. 8. However, Lowenthal's Claim against EBY specifically alleges a contractual relationship with EBY, which is sufficient under Florida law to make Lowenthal vicariously liable to EBY.  _See, e.g._, _Salit v. Ruden, McClosky, Smith, Schuster & Russell_, 742 So. 2d 381 (Fla. 4th DCA 1999) (stating that an employer-employee relationship is sufficient to impose vicarious liability on the employer for the negligent acts of its employee); _see generally_ Deposition of Robert Lowenthal at pp. 24-27, attached hereto as Exhibit "A" (confirming the existence of the Contract between Lowenthal and EBY); _see also_ The Contract attached to EBY's Memorandum of Law at Tab 1.

Alternatively, EBY contends in its Memorandum of Law that, "even if [Lowenthal] were found to be vicariously liable for EBY's alleged conduct . . . the proportionate fault rule would govern in apportioning such liability," and thus, Lowenthal would be adequately protected from paying damages to The Estate.  _See_ Petitioner's Memorandum of Law at p. 9.  However, this contention is also misplaced.  Instead, it is clear that the proportionate fault rule **does not apply** in situations like the instant case, where one defendant who is vicariously liable for the plaintiff's harm is seeking indemnification from another defendant who is actually at fault due to some wrongdoing on its part.  _See, e.g._, _Chisholm v. UHP Projects, Inc._, 205 F.3d 731 (4th Cir. 2000);

<u>Chisholm v. UHP Projects, Inc.</u>, 30 F.Supp.2d 928 (E.D. Va. 1998);
<u>Boykin v. China Steel Corp.</u>, 73 F.3d 539 (4th Cir. 1996);
<u>Westinghouse Credit Corp. v. M/V New Orleans</u>, 39 F.3d 553 (5th Cir. 1994).

By way of background, the proportionate fault rule was adopted by the Supreme Court in <u>McDermott, Inc. v. AmClyde</u>, 511 U.S. 202 (1994), as a way to apportion damages between defendants according to each defendant's proportionate share of the responsibility. <u>See Chisholm v. UHP Projects, Inc.</u>, 30 F.Supp.2d 928, 935 (E.D. Va. 1998). Under the proportionate share approach, the finder of fact must determine the total damages from all joint causes and the proportion of each tortfeasor's share of joint and several liability. <u>Westinghouse Credit Corp. v. M/V New Orleans</u>, 39 F.3d 553, 555 (5th Cir. 1994). Although principles of joint and several liability survive, a defendant cannot initially be assessed any amount of damages larger than its proportionate share of all damages as determined by its proportionate share of all liability. <u>Id.</u>

The proportionate share rule also applies to suits for contribution. In this sense, non-settling defendants pay only their portion of the total liability. <u>McDermott</u>, 511 U.S. at 221. Specifically, a suit for **contribution** against a settling defendant is not permitted under the <u>McDermott</u> approach, nor is one necessary, because the non-settling defendant pays no more than its

4

share of the judgment.

However, contrary to EBY's contentions, it is clear that the proportionate share approach of McDermott does not apply here to preclude Lowenthal's claim for **indemnity** against EBY. In fact, EBY's contention that the proportionate share approach can be equally applied to bar both contribution and indemnity claims by a vicariously liable defendant against a defendant guilty of actual wrongdoing has been specifically rejected. See Boykin v. China Steel Corp., 73 F.3d 539, 543 (4th Cir. 1996) (rejecting a negligent defendant's argument that indemnity is equated to contribution, and is therefore unavailable to a vicariously liable defendant under McDermott).

Instead, it is clear that the proportionate share rule only applies in cases where there has been a settlement by a **joint** tortfeasor. See Boykin v. China Steel Corp., 73 F.3d 539, 544 (4th Cir. 1996); Westinghouse Credit Corp. v. M/V New Orleans, 39 F.3d 553, 555 (5th Cir. 1994) (holding that the proportionate share rule of McDermott does not apply in favor of a non-settling defendant unless it is a joint tortfeasor with the settling defendant); see also McDermott, Inc. v. AmClyde, 511 U.S. 202 (1994) (holding that where a plaintiff settles with one joint tortfeasor, the non-settling defendant is entitled to a credit for the amount of damages attributable to the conduct of the settling defendant and thus, the non-settling defendant only pays its portion of the total

5

liability).  In the instant case, Lowenthal and Eby are not joint tortfeasors.  Rather, Lowenthal has alleged that Eby is the sole tortfeasor, thus entitling Lowenthal to indemnity.

Obviously, in situations where the settling defendant and the non-settling defendant are under different legal duties with respect to the plaintiff's damages, and thus, are not joint tortfeasors, the proportionate share rule does not apply.  See Chisholm v. UHP Projects, Inc., 30 F.Supp.2d 928, 936 (E.D. Va. 1998); see also Boykin, 73 F.3d at 543 (stating that indemnity is appropriate when the indemnitee has been found absolutely liable for the wrongful act of another, as in the admiralty context where a defendant held liable on an unseaworthiness claim is awarded indemnity against the party whose negligence caused the unsafe condition).

Critically, in Chisholm, the proportionate share rule was held not to apply where one defendant's liability arose by operation of law (i.e., its liability was not based on fault) and the other defendant's liability arose from its own negligence (i.e., its liability was based on fault) because, in such instance, the two defendants were not joint tortfeasors.  Chisholm 30 F.Supp.2d at 936.  Thus, because the proportionate fault rule of McDermott does not protect defendants whose liability arises by operation of law, they are entitled to indemnity from defendants whose liability arises from fault.  See Boykin, 73 F.3d at 544.

6

Here, because Lowenthal has alleged that it and EBY are not joint tortfeasors, but rather are under different legal duties with regard to the plaintiff's damages, EBY's contention that the proportionate share rule would protect Lowenthal from owing damages to The Estate is clearly misplaced. Therefore, because it is clear that general maritime law recognizes the availability of common law indemnity for defendants held vicariously liable, EBY's Motion for Summary Judgment as to indemnity must be denied.

> **BARTLETT, HEEKIN, SMITH,**
> **GREENE & MALIN, P.A.**
>
> By:_____
> T. Geoffrey Heekin
> Florida Bar No. 328448
> Ann K. Smith
> Florida Bar No. 9938
> P.O. Box 477
> Jacksonville, FL 32201
> Telephone No.: 904-355-7000
> Attorney    for    Defendant
> The Lowenthal Group, Inc.

## Certificate of Service

I HEREBY CERTIFY that a copy of the foregoing has been furnished to Joseph P. Milton, Esquire, 815 South Main Street, Suite 200, Jacksonville, FL 32207; Michael P. Leahy, Esquire, 501 W. Bay Street, Jacksonville, FL 32202 and Clinton Flagg, Esquire 1320 S. Dixie Hwy., Ste. 1180, Coral Gables, FL 33146, via UNITED STATES MAIL this 1st day of August, 2003.

_____
Attorney

ROBERT LOWENTHAL

IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR
DUVAL COUNTY, FLORIDA

CASE NO.   02-07533-CA
DIVISION:   CV-B

BARBARA MONGEON, as Personal
Representative of the Estate of
BEVERLY J. BRITTAIN,

        Plaintiff,

v.

MARTIN K. EBY CONSTRUCTION
COMPANY, INC., a Foreign
Corporation,

and

THE LOWENTHAL GROUP, INC.,
a Florida Corporation,

        Defendants.

-----------------------------------

        Deposition of ROBERT LOWENTHAL taken
pursuant to Notice of Taking Deposition Duces Tecum,
on behalf of the Plaintiff herein, on Tuesday, April
15, 2003, at the offices of Moseley, Warren,
Prichard & Parrish, 501 West Bay Street,
Jacksonville, Florida; commencing at approximately
9:10 a.m, before Cindy D. McClary, RPR, CRR, and a
Notary Public in and for the State of Florida at
Large.

CERTIFIED COURT REPORTERS, INC.
ONE INDEPENDENT DRIVE, SUITE 3110
JACKSONVILLE, FLORIDA 32202
(904)356-4467

---

ROBERT LOWENTHAL                                    3

                            Page

Direct Examination by Mr. Milton . . . . . . 4

Cross Examination by Mr. Moseley . . . . . 146

Redirect Examination by Mr. Milton . . . . 185

Reporter's Certificate . . . . . . . . . . 190

            - - -

NO EXHIBITS

CERTIFIED COURT REPORTERS, INC.
(904)356-4467

---

ROBERT LOWENTHAL                                    2

A P P E A R A N C E S

JOSEPH P. MILTON, ESQUIRE
  Milton, Leach, Whitman, D'Andrea,
  Charek & Milton, P.A.
  815 South Main Street
  Suite 200
  Jacksonville, Florida  32202

Appearing on behalf of the Plaintiff

JAMES F. MOSELEY, ESQUIRE
P. MICHAEL LEAHY, ESQUIRE
  Moseley, Warren, Prichard & Parrish
  501 West Bay Street
  Jacksonville, Florida  32202

Appearing on behalf of Defendant
Martin K. Eby Construction Co.

CLINTON D. FLAGG, ESQUIRE
  1320 South Dixie Highway
  Suite 1180
  Coral Gables, Florida  33146

  - AND -

T. GEOFFREY HEEKIN, ESQUIRE
  Bartlett, Heekin, Smith,
  Greene & Malin, P.A.
  One Independent Drive, Suite 2200
  Jacksonville, Florida  32202

Appearing on behalf of Defendant
The Lowenthal Group, Inc.

CERTIFIED COURT REPORTERS, INC.
(904)356-4467

---

ROBERT LOWENTHAL                                    4

ROBERT LOWENTHAL,
having been produced and first duly sworn as a
witness, testified as follows:

        DIRECT EXAMINATION

BY MR. MILTON:
    Q    Would you state your full name and your
residence address, please?
    A    My name is Robert Lowenthal.  My address,
3609 Marsh Park Court, Jacksonville, Florida, 32250.
    Q    And how long have you lived at that
address, Mr. Lowenthal?
    A    About four years.
    Q    And what is your occupation?
    A    I have a dredging company.
    Q    And the name of that company?
    A    The Lowenthal Group, Inc.
    Q    And how long have you had that dredging
company?
    A    Four years.
    Q    And what's the business address for the
company?
    A    Same as my home address.
    Q    Same as your home, okay.  What did you do
before you became the owner of The Lowenthal Group?
    A    I was an airline pilot.

CERTIFIED COURT REPORTERS, INC.
(904)356-4467

**EXHIBIT** *"A"*

1  spoil site. And so, they terminated me and hired
2  him.
3      Q    Was your contract with The Moorings
4  terminable at will?
5      A    I'm not sure I know what that means.
6      Q    Okay. I mean, you just give somebody 24
7  hours' notice and that was the end of the --
8      A    I don't remember seeing that in the
9  contract that they were allowed to do that.
10     Q    Okay. Was there any litigation at all
11 over that?
12     A    No.
13     Q    All right, sir. So Lem, did you say?
14     A    Lynn, L-Y-N-N.
15     Q    Lynn. Took over that job?
16     A    That's correct.
17     Q    And then what work did you find for the
18 dredge then?
19     A    Then I chartered it to -- oh, no. No,
20 I didn't. I -- then I got the job with Eby.
21     Q    All right. And that contract, I think,
22 was April of --
23     A    Approximately.
24     Q    -- of '02?
25     A    April of '02.

2  project engineer and negotiated the whole
3  contract. Then on the very last day, Chris signed
4  it.
5      Q    Okay.
6  MR. FLAGG:  He just asked you whether Matt
7  signed the subcontract.
8  THE WITNESS:  Oh.
9  MR. FLAGG:  The answer to that would be?
10 THE WITNESS:  No. I'm sorry.
11 MR. FLAGG:  You're doing great.
12 THE WITNESS:  I'm sorry.
13 BY MR. MILTON:
14     Q    How much lag time was there between the
15 job that you had at The Moorings and starting -- or
16 being contacted by Keith Sheaks? Was there an
17 appreciable period that the dredge was just laid up?
18     A    Three months.
19     Q    Where did you keep the dredge when it
20 wasn't working?
21     A    At the Pablo Creek Marina.
22     Q    Okay. Did -- were you required by Coast
23 Guard or the Corps of Engineers or anybody to have a
24 survey of the dredge any time you went onto a job
25 site?
1      A    No.

1      Q    Had any other dredging company been on
2  that job site before you?
3      A    Not that I know of.
4      Q    All right. And who did you negotiate
5  with?
6      A    Keith Sheaks. Let me -- let me -- Keith
7  Sheaks came over and asked me if I wanted to -- to
8  do the job for them. I said yes. And we talked a
9  little bit, and then he turned me over to -- I've
10 forgotten his name, Matthew.
11     Q    Swayne maybe?
12     A    No.
13     Q    No?
14     A    For some reason, his name escapes me. I
15 was trying to think of it yesterday. I have it
16 written down somewhere, I think, but... He was the
17 project engineer at the time.
18     Q    Okay.
19     A    And him and I negotiated the contract.
20     Q    Was he the person that perhaps signed off
21 on the contract?
22     A    No, that was Chris DuBois, who was here
23 yesterday.
24     Q    I see.
25     A    No, he was the project manager, but the

1      Q    Other than when you bought it, and I
2  assume you had it surveyed at that point, did the
3  dredge have any further surveys from then up through
4  July of '02?
5      A    I believe so.
6      Q    And do you know the last time it had been
7  surveyed prior to July of '02?
8      A    I don't know. Off the top of my head, I
9  don't remember what date that was.
10     Q    Would that have been in conjunction with
11 the contract of 4/12/02 with Eby?
12     A    Probably yes, indirectly, insofar as the
13 insurance company required this.
14     Q    Do you remember the name of the company?
15     A    The company that surveyed it?
16     Q    Yes, sir.
17     A    No, I don't offhand.
18     Q    How about the insurance company, do you
19 remember the name of that?
20     A    Essex.
21     Q    Essex?
22     A    Yes.
23     Q    E-S-S-E-X?
24     A    Correct.
25     Q    Is that the actual broker or is that the

ROBERT LOWENTHAL                                                                    25

2   A   That's the company.
3   Q   Do you know who you wrote it through?
4   A   Advanced Insurance.
5   Q   Where are they located?
6   A   Jacksonville.
7   Q   In Jax or the beach?
8   A   In Jacksonville.
9   Q   And who is the principal you dealt with
10  there?
11  A   His name is Chuck Powell, P-O-W-E-L-L.
12  Q   And how did that work? Did you go in and
13  tell him you had a job you were working or did you
14  go in and say, this is a rough draft of a contract,
15  quote me some prices, or how did you go about
16  getting any insurance that you thought may have been
17  called for under the contract?
18  A   They had been my insurer previously, so...
19  Q   I see. They had written you for some of
20  these other jobs?
21  A   Uh-huh.
22  Q   You have to say the word yes or no.
23  A   They had -- yes.
24  Q   All right.
25  A   They -- so I --

CERTIFIED COURT REPORTERS, INC.
(904)356-4467

ROBERT LOWENTHAL                                                                    26

1   MR. HEEKIN:  There's not a question
2   pending.  There's not a question pending.
3   MR. MILTON:  Well, let him finish his
4   answer.
5   MR. HEEKIN:  The answer is yes.
6   THE WITNESS:  Yes, okay.
7   MR. MILTON:  Well, I'm not deposing you,
8   so --
9   THE WITNESS:  That was it.  Yes is --
10  yeah.
11  BY MR. MILTON:
12  Q   Okay.  Let's go back to Mr. Powell with
13  Advanced Insurance.  Did you have any written
14  correspondence with him concerning the insurance
15  that you were required to have under the contract
16  with Eby?
17  A   Yes.
18  Q   Would you still have that correspondence?
19  A   Perhaps.  I'm not sure.
20  Q   All right.  While I'm talking about any
21  documents, would you still have the correspondence
22  between you and Eby concerning any negotiations on
23  the contract?
24  A   I have some documents on that, yes.
25  Q   And would those be at your home and,

CERTIFIED COURT REPORTERS, INC.
(904)356-4467

ROBERT LOWENTHAL                                                                    27

2   A   Yes.
3   Q   Do you have any correspondence dealing
4   with them after you started that contract and before
5   it was terminated?
6   A   Yes.
7   Q   And, again, I assume you have some
8   correspondence since it's been terminated?
9   A   Yes.
10  Q   Do you have the actual insurance policies
11  that Mr. Powell placed for you through Essex
12  Insurance?
13  A   Yes.
14  Q   And that's also in your possession?
15  A   Yes.
16  Q   Okay.  All right.  What other
17  correspondence would you have pertaining to this Eby
18  job, Wonderwood project?
19  A   Well, I have some, not exactly daily
20  reports that I faxed to Keith Sheaks to tell him the
21  progress of the job.
22  Q   All right.  Would that be in possession of
23  Eby or would you have copies of them?
24  A   Should be both.
25  Q   Okay.  So progress reports, daily progress

CERTIFIED COURT REPORTERS, INC.
(904)356-4467

ROBERT LOWENTHAL                                                                    28

1   reports would that be called, or weekly or what?
2   A   That was my intention they would be daily.
3   Q   Turned out not to be daily?
4   A   No.
5   Q   Okay.  What was the purpose of your
6   contract?  What was the job to be done?
7   A   Okay.  They wanted me to dredge a little
8   canal through a narrow island so they could bring
9   their barges in.
10  Q   In to work on the bridge?
11  A   Yes.
12  Q   We've been furnished a couple of aerial
13  photos.  Let me show you one here that I think
14  yesterday was marked as No. 2 to somebody's exhibit
15  that Mr. Flagg had marked.  Does this show kind of
16  an aerial of the project itself?
17  MR. FLAGG:  That is the photograph
18  previously marked as Exhibit 2.
19  MR. MILTON:  Okay.
20  THE WITNESS:  I'm sorry, your question
21  was?  Is this the area?
22  BY MR. MILTON:
23  Q   Yes, sir.
24  A   Yes, it is.
25  Q   And can you see in the photograph the area

CERTIFIED COURT REPORTERS, INC.
(904)356-4467